Reeves *v.* Walker.

WM. P. REEVES *et al.*, Trustees, etc., *v.* THOS. S. WALKER *et al.*, Trustees, etc.

CHURCH TRUSTEES. *Separation of Methodist Episcopal Church.* In 1811 certain land was conveyed to certain named persons, and their successors, as trustees of the Methodist Episcopal Church, to be used for the purpose of worship, according to the discipline and government of that church. It was so used and held until the church separated into the two organizations, viz: The Methodist Episcopal Church, South, and the Methodist Episcopal Church, North. Under the articles of separation adopted at the time the separation took place, it was provided, among other things, that the church property in conference districts uniting with either organization should become the property of the particular organization (North or South) united with. Under the articles of separation, the Holston Conference, in whose district this property lay, united with the Southern branch. The property remained thus until 1865, when the Church, North, took possession of the property, and held it as its property. This was done by the secession of a number of the members of this particular church, and three of its trustees from the Church, South, and uniting with the Northern branch. In a contest between the trustees who claimed it as the property of the Church, South, and the trustees who claimed as the property of the Church, North: *Held,* that the trustees of the Church, South, had the better right, because the separation of the Methodist Episcopal Church being valid, the property in question became the property of the Church, South, by the union of the Holstein Conference with that organization; and the secession of three of the trustees and other members did not carry with them the title.

FROM WASHINGTON.

Appeal from the Chancery Court.

No record found.

NICHOLSON, C. J., delivered the opinion of the court.

Complainants are trustees of the Methodist Episcopal Church, South, regularly appointed in pursuance of the rules and regulations of that church. They claim to have the legal title and the right of possession to a lot of ground of four acres, with the improvements thereon, in Washington county, specially described in the pleadings for the use and benefit of the Methodist Episcopal Church, South. They allege that the defendants are trustees of the Methodist Episcopal Church, regularly appointed in pursuance of the rules and regulations of that church, and that as such trustees, for the use and benefit of the Methodist Episcopal Church, defendants, in 1865, took possession of the property in controversy, and still hold the same.

Complainants and defendants deraign their respective titles from the same common source. It is agreed, that in 1811, David or James Nelson donated the four acres of land to certain named persons and their successors, as trustees of the Methodist Episcopal Church, for the use and benefit of that church, for purposes of worship, according to the discipline and government of that church; and that it continued to be so held by the original trustees and their successors, with the parsonage and other improvements placed thereon, for the use and benefit of the Methodist Episcopal Church, until 1845, when the Methodist Episcopal Church, South, was organized as a separate and independent ecclesiastical body, composed of that portion of the members of the Methodist Episcopal Church located in the Southern or slave-holding States; and from that

period, down to 1865, the same trustees and their regular successors held and used the property for the use and benefit of the Methodist Episcopal Church, South.

It further appears, that after the close of the late war, to-wit: in 1865, societies, stations, and conferences were organized under the pastoral care of the Methodist Episcopal Church, and by the proper ecclesiastical body, trustees of the Methodist Episcopal Church were appointed to take and hold the property in question, for the use and benefit of that church, and that accordingly the defendants, as such trustees, took the possession and continued to hold it.

It further appears, that upon the organization of the societies in the Jonesboro Circuit, under the pastoral care of the Methodist Episcopal Church, in 1865, many of the members of the Methodist Episcopal Church, South, who had previously enjoyed the use and benefit of the property, withdrew from the Methodist Episcopal Church, South, and attached themselves to the Methodist Episcopal Church, among whom were three who had been acting as trustees of the Methodist Episcopal Church, South, but who are now trustees of the Methodist Episcopal Church, and defendants to this bill.

The controlling question of law arising upon these facts is, in whom was vested the beneficial interest in the property in dispute in 1865, when the defendants took possession under their claim as trustees of the Methodist Episcopal Church?

The answer to this question depends necessarily upon the legal effect of the separation of the church in 1845. Down to that time it is not contended that the title and the beneficial interest were in the Methodist Episcopal Church, South.

But the question is, did the Methodist Episcopal Church, South, by force of that separation, become a distinct, separate, and independent ecclesiastical organi-organization, and if so, did the title to the property pass and vest in the trustees of the Methodist Episcopal Church, South?

These questions arose and were determined in the case of *Smith et als.* v. *Swormstedt et als.*, 16 Howard, 288. In that case Justice Nelson stated the legal effect of the separation of the Methodist Episcopal Church as follows:

"In the year 1844, the traveling preachers, in General Conference assembled, for causes which it is not necessary particularly to refer to, agreed upon a plan for division of the Methodist Episcopal Church, in case the annual conferences in the slave-holding States should deem it necessary; and to the erection of two separate and distinct ecclesiastical organizations. And accessory to their plan, it was agreed that all the societies, stations, and conferences adhering to the Church, South, by a majority of their respective members, should remain under the pastoral care of that church; and all of these several bodies adhering, by a majority of members, to the Church, North, should remain under the pastoral care of that church; and, further, that the ministers, local and traveling, should,

Reeves *v.* Walker.

as they might prefer, attach themselves, without blame, to the Church North or South.

"It was also agreed, that the common property of the church, including this book concern, that belonged specially to the body of the traveling preachers, should, in case the separation took place, be divided between the two churches, in proportion to the number of travelling preachers falling within the respective divisions. This was in 1844. In the following year the Southern Annual Conference met in convention, in pursuance of the plan of separating, and determined upon a division, and resolved that the Annual Conference should be constituted into a separate ecclesiastical connection, and based upon the discipline of the Methodist Episcopal Church, comprehending the doctrines, and entire moral, ecclesiastical, and economical rules and regulations of said discipline, except only so far as verbal alterations might be necessary, and to be known by the name of the Methodist Episcopal Church, South.

"The division of the church, as originally constituted, then became complete, and from this time two separate and distinct organizations have taken the place of the one previously existing."

Again, Justice Nelson said: "We entertain no doubt but that the General Conference of 1844 was competent to make the division; and that each division of the church, under the separate organization, is just as legitimate, and can claim as high a sanction, ecclesiastical and temporal, as the Methodist Episcopal Church first founded in the United States. The same author-

ity which founded that Church in 1784, has divided it, and established two separate and independent organizations, occupying the place of the old one."

This authority is conclusive as to the legality of the division of the church, and as to the Methodist Episcopal Church, South, being a separate and independent ecclesiastical organization.

We may remark, in this connection, that the consummation of the plan of separating was made to depend upon the action of the conferences in the Southern States, and among those which assented to the plan of separation, was the Holston Conference, whose jurisdiction embraced the property now in controversy.

The next question is, as to the legal effect of the separation on the title to the property. The ninth article of the plan of separation was as follows: "That all the property of the Methodist Episcopal Church in meeting-houses, parsonages, colleges, schools, conference funds, cemeteries, and of every kind within the limits of the Southern organization, should be forever free from any claim set upon the part of the Methodist Episcopal Church, so far as this resolution can be of force in the premises."

Before the separation the title to the property in controversy was in the trustees of the Methodist Episcopal Church, for the use and benefit of the church— not exclusively for the use and benefit of the individual ministers who worshipped in the meeting-house, or at the camp-ground, but the whole church was the beneficiary—those constituting the church in the North

as well as in the South. The legal effect of the
ninth article of separation, was, a release by the
Northern portion of the church to the Southern por-
tion of all future interest in the property. By this
means the beneficial interest was fixed exclusively in
the Methodist Episcopal Church, South, and after that
time the legal title was held by the trustees for the
use and benefit of the Methodist Episcopal Church,.
South. The ninth article operated as an effectual es-
toppel against the Methodist Episcopal Church as to·
any future claim.

This consequence is in no way effected by the fact
that a large portion—even a majority—of the members·
of the church who worshipped on the premises with-
drew from the Methodist Episcopal Church, South, and
united with the Methodist Episcopal Church; nor by
the fact that three of the trustees of the Methodist
Episcopal Church, South, withdrew and became trustees
of the Methodist Episcopal Church. The effect of
such withdrawal was to lose all interest as beneficiary
of the property.

In the language of the court, in the case of *Wat-
son* v. *Jones*, 13 Wall., 734, "The withdrawing mem-
bers" now deny its authority, denounce its action, and
refuse to abide by its judgments. They have first
erected themselves into a new organization, and have
since joined themselves to another totally different, if
not hostile, to the one to which they belonged when
the difficulty first began.

Under any of the decisions which we have ex-
amined, the appellants, in this present position, have

no right to the property, or to the use of it, which is the subject of the suit.

It follows, that complainants are entitled to the property in controversy, and to reasonable rents from the time defendants took unlawful possession in 1865, instead of from the filing of the bill, as decreed by the chancellor. In all other respects the decree of the chancellor is affirmed, with costs, and the case is remanded for further proceedings.